# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW ROJESKI et al., <br>     Plaintiffs, <br><br> v. <br><br> MASTER MOVING, INC. et al., <br>     Defendants. | 2:25-cv-01741-DSF-MBK <br><br> Order GRANTING IN PART and DENYING IN PART Defendants' Motion to Dismiss Plaintiffs' Complaint (Dkt. 40) |

Defendants Master Moving, Inc. and Batia Zelig move to dismiss the Complaint. Dkt. 40 (Mot.) Plaintiffs Matthew Rojeski and Ashelyn Rojeski oppose.[1] Dkt. 42 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

In December 2023, Plaintiffs Matthew Rojeski and Ashelyn Rojeski obtained a "Binding Moving Estimate" of $1,888.12 from Defendant Master Moving to transport Plaintiffs' property from their residence in Wilsonville, Oregon to Morgantown, West Virginia. Dkt. 1 (Compl.) ¶ 10. The Binding Moving Estimate estimated the volume of

---

[1] To avoid confusion, the Court refers to the Rojeskis by their first names.

the property to be 310 cf., or 2,170 pounds, and included an instruction to read the Federal Motor Carrier Safety Administration's (FMCSA) publication: "Your Rights and Responsibilities When You Move" (the FMCSA Booklet). Id. ¶¶ 10-11. The FMCSA Booklet states that "[y]ou and your mover may agree to change an estimate of charges based on changed circumstances, but only *before your shipment is loaded. Your mover may not change an estimate after loading the shipment.*" Id. ¶ 12 (citing Dkt. 1-2 at 4) (emphasis in Complaint). It further provides:

> A binding estimate guarantees that you cannot be required to pay more than the amount on the estimate at the time of delivery. . . . If the mover does not give you a new binding estimate in writing, or agree in writing to convert the binding estimate to a non-binding estimate *before your goods are loaded, the original binding estimate is reaffirmed.*

Id. (citing Dkt. 1-2 at 5) (emphasis in Complaint). Although Plaintiffs and Master Moving had agreed on a pick-up date of January 2, 2024, a mover called Plaintiffs on or around December 31, 2023, to tell them he would be arriving in thirty minutes. Id. ¶¶ 13-14. Ultimately, Plaintiffs agreed to a pick-up date of January 1. Id. ¶ 15. Plaintiffs attempted to finish packaging their household goods, but Matthew suffered a slip and fall accident outside of their apartment and spent most of the night in the emergency room. Id. ¶¶ 16-17.

When the movers arrived the next morning, they noted that not all of Plaintiffs' property was in boxes but told Plaintiffs they would not charge them for packing or supplies. Id. ¶ 18. "After loading the Plaintiffs' property having a purported volume of 310 c.f. (2,170 lbs), Master Moving staged the additional property on the pavement in a manner that blocked traffic and impeded resident access to the Plaintiffs' apartment building." Id. A mover told Matthew he could either pay $3,000 for the movers to unload the truck and then find a different mover, or he could pay more for the movers to load the rest of the items on the truck. Id. ¶ 20. Matthew agreed to the latter and was informed the new cost was $8,000 only *after* the movers had loaded the additional property. Id. ¶ 21. Although he objected to the price

2

increase, Matthew agreed to pay Master Moving $5,000 and to pay the balance upon delivery. Id. ¶ 22. Matthew photographed the check and the Bill of Lading, which contained the pick-up and delivery addresses, the earliest date for delivery—January 6, 2024, his signature, and the total charge of $8,488.12. Id. ¶¶ 23, 25 (citing Dkt. 1-3).

On January 4, 2024, Plaintiffs arrived at their new apartment. Id. ¶ 25. Master Moving texted Matthew that the truck would be arriving the next day, January 5, 2024, between 3:00 p.m. and 5:00 p.m., and that he should have the balance of $3,000 in cash or postal money order, but Plaintiffs did not receive the text until 12:25 on January 5 and did not agree to an early delivery. Id. ¶¶ 24, 26-27 (citing Dkt. 1-4). Regarding early delivery, the FMCSA Booklet states:

> If you are unable to accept delivery before the first day of the delivery spread, then your mover may place your shipment in storage in a warehouse located in proximity to the destination. If your mover exercises this option, your mover must immediately notify you of the name and address of the warehouse where your mover places your shipment. Your mover has full responsibility for the charges for re-delivery, handling, and storage until it makes the final delivery.

Id. ¶ 28 (citing Dkt. 1-2 at 15). On January 5, the moving truck driver texted Plaintiffs that he did not believe the truck would fit in the unloading area for the apartment and that he did not have any help for unloading the truck. Id. ¶ 29. When Matthew called Master Moving to ensure Plaintiffs would not have to unload the truck and to state he believed there was adequate space to unload the truck, the individual to whom he spoke repeatedly screamed "SEND ME PICS!!" Id. ¶ 30. At around 3:45 p.m., Matthew's phone broke, so Plaintiffs went to a store about six minutes away to purchase a new one. Id. ¶ 31. At 5:31 p.m., the driver texted that he was at Plaintiffs' front door. Id. ¶ 32 (citing Dkt. 1-6). Starting at 6:02 p.m., Master Moving sent Matthew at least ten texts stating the driver was at Plaintiffs' apartment, but Matthew was still downloading data to his new phone and did not receive them. Id. ¶¶ 33-34 (citing Dkt. 1-7). At 6:15 p.m., Master

3

Moving texted Ashelyn, "Guys's [sic] we're at your door. U chose not to receive your goods. Driver will be leaving for California tonight. U guys can rent a truck and come Pic it up from as [sic]. Good day." Id. ¶ 35 (citing Dkt. 1-8).

Shortly after, Plaintiffs returned to their apartment and saw two men standing by a U-Haul. Id. ¶ 36. When Plaintiffs told one of the men that they were going to confirm his identity with the manager at Master Moving, he responded, "We've been here for hours and we have your shit." Id. Matthew then called Master Moving, but the manager called him a "little bitch" and stated he had "all of [Plaintiffs'] fucking shit." Id. ¶ 37. Matthew "explained that he did not know the people outside his door who came in a 26 foot U-Haul when he was expecting a 56' tractor trailer," and the manager responded that he paid for the shuttle and would charge them $2,000 extra. Id. ¶¶ 38-39. "When [Matthew] protested, the manager repeatedly screamed, 'FUCK YOU, YOU FUCK . . . FUCK YOU, SUE ME! GET YOUR SHIT IN CALIFORNIA[]!'" Id. ¶ 39. The manager continued to scream, yell profanities, and ask for the $3,000 allegedly owed under the Bill of Lading. Id. ¶¶ 40-41. To try to make amends and obtain their property, Ashelyn called the manager, but the manager screamed, "FUCK YOU BITCH, FUCK YOU, FUCK YOU SUE ME! I HAVE YOUR SHIT AND MY GUYS ARE TAKING IT TO CALIFORNIA! I'M DOING YOU A FAVOR, PAY ME $3,000.00 CASH NOW BECAUSE THEY ALREADY LEFT." Id. ¶ 42. One of the movers then approached Ashelyn and told her he was charging Plaintiffs $2,000 in addition to the $3,000, but Plaintiffs refused to pay the extra funds. Id. ¶¶ 43-44.

Because the movers left with Plaintiffs' specialized litter box for their cat that prevents Matthew's Emotional Support Animal, a dog, from eating the cat litter, their dog ate the litter, became septic, and died. Id. ¶¶ 47-48. Then, on the way to Florida to stay with friends, Matthew suffered a mental breakdown, and Ashelyn took him to the Veterans Administration Hospital, where he was "beaten with a baton until he lost consciousness." Id. ¶¶ 50-52.

4

At some point after January 6, 2024, Master Moving provided Matthew with an "Interstate New Visual Binding Estimate Prior to Loading" that stated the new estimate price had been given to him on January 1, 2024, before the truck was loaded. Id. ¶ 46. The document showed that Master Moving was charging an additional "$5,084.00 for 820 cubic feet of space," $1,000 for packing material, and $404 for a fuel surcharge, for a total bill of $6,488. Id. Although it purportedly had Matthew's signature from January 1, the document was materially different from the one Matthew had photographed that day. Id. On January 12, Master Moving sent Plaintiffs the first communication regarding the location of their property, which they had believed was in California. Id. ¶ 54. The email stated:

> This is Lucia with Master Moving we are contacting you in regards to your delivery. As per our last contact with you, you stated that you were tying [sic] to get a loan for the remaining balance of $1,000 through your bank. Please let us know when you will have the balance available as your household goods are in storage near you. You have the option to ZELLE or you can overnight a cashier's check for your payment and pick up your household goods from the storage once you have made your payment. Your second option would be for us to deliver your goods to your home however there will be a redelivery fee of $800 and a shuttle that you are aware of for the amount of $800. If you choose the second option your total payment will be $2600 that includes your balance, the redelivery fee and the shuttle fee. Your household goods are at this address 1221 Canyon Rd Morgantown, WV 26508 which I am being informed it's not that far from your home address. Please let me know which option you choose.

Id. ¶ 53; see also Dkt. 1-9. Master Moving again emailed Matthew on January 31, 2024, stating, "This is the last attempt we are trying to reach you. We would like for you to go pick up your household goods at the storage free of charge otherwise we will not be able to keep your household goods." Compl. ¶ 53; see also Dkt. 1-9. On February 1, 2024, Plaintiffs' counsel wrote to Master Moving to demand the delivery of

5

Plaintiffs' property. Compl. ¶ 56 (citing Dkt. 1-10). Plaintiffs are still without their property. Id. ¶ 57.

## II. LEGAL STANDARD

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (alteration in original) (quoting Twombly, 550 U.S. at 557). A complaint must "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . [and] the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

"Normally, when a viable case may be pled, a district court should freely grant leave to amend." Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., 637 F.3d 1047, 1058 (9th Cir. 2011). Leave to amend should be granted even if the plaintiff did not request leave, unless it is clear that the complaint cannot be cured by the allegations of different or additional facts. Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995).

## III. DISCUSSION

Plaintiffs assert five claims against Defendants: (1) Carmack Amendment—reaffirmation of the December 2023 Binding Estimate; (2) Carmack Amendment—falsifying documents; (3) Carmack Amendment—failure to deliver household goods; (4) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO); and (5) intentional infliction of emotional distress (IIED). Defendants move to dismiss the entire Complaint, with limited leave to amend. Mot. at 14.

### A.   Carmack Amendment Claims

Defendants argue that "[t]he Carmack Amendment bars most of [P]laintiffs' theories, and [P]laintiffs' damages are limited to the actual losses sustained to their property." Mot. at 3. Specifically, they argue that the Bill of Lading, the contract between the parties, limits their liability to $0.60 per pound for any delayed, damaged, lost, or destroyed property of Plaintiffs. Id. at 5-6. Although Plaintiffs agree that the Carmack Amendment preempts most state law claims, they argue that Defendants fail to address Plaintiffs' first three claims predicated on the Carmack Amendment. Opp'n at 2, 4. Plaintiffs also argue that the enforceability of the $0.60 per pound limitation of liability—referenced in the "Binding Moving Estimate," not the Bill of Lading—is a factual determination governed by the four-part test established in Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609 (9th Cir. 1992).[2] Id. at 2, 5.

"It is well settled that the Carmack Amendment is the exclusive cause of action for interstate-shipping contract claims alleging loss or damage to property." Hall v. N. Am. Van Lines, Inc., 476 F.3d 683, 688 (9th Cir. 2007). "The Supreme Court has stated that the Carmack

---

[2] Based on Plaintiffs' citation to Hughes v. North American Van Lines, 829 F. 2d 1407 (7th Cir. 1987), it is not clear whether Plaintiffs meant to refer to Hughes v. United Van Lines, Inc., 829 F.2d 1407 (7th Cir. 1987), or Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609 (9th Cir. 1992). Because both cases discuss the same four-part test, the Court assumes Plaintiffs relied on the Ninth Circuit case—Hughes Aircraft Co.

7

Amendment is 'comprehensive enough to embrace responsibility for all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation.'" Titans Trading Corp. v. JTS Express, No. CV 09-00714 MMM (RCx), 2009 WL 537515, at *3 (C.D. Cal. Mar. 3, 2009) (citing Ga., Fla., & Ala. Ry. Co. v. Blish Milling Co., 241 U.S. 190, 196 (1916)). The Carmack Amendment preempts state law claims "whether they contradict or supplement Carmack remedies." Coughlin v. United Van Lines, LLC, No. CV 0410576 R (MANx), 2005 WL 8155022, at *3 (C.D. Cal. June 22, 2005) (collecting cases).

Before attempting to limit its liability for the loss or injury to property, a carrier has the burden of proving it complied with the requirements to:

> (1) maintain a tariff in compliance with the requirements of the Interstate Commerce Commission; (2) give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper's agreement as to his choice of carrier liability limit; and (4) issue a bill of lading prior to moving the shipment that reflects any such agreement.

Hughes Aircraft Co., 970 F.2d at 611-12. The Ninth Circuit has held that instead of complying with the first element of the Hughes test, "a motor carrier must now, at the shipper's request, provide the shipper with 'a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based.'" OneBeacon Ins. Co. v. Haas Indus., Inc., 634 F.3d 1092, 1100 (9th Cir. 2011) (quoting 49 U.S.C. § 14706(c)(1)(B)).

Plaintiffs assert three Carmack Amendment claims. Their only state law claim is their IIED claim, which the Court addresses below. Plaintiffs recognize the preemptive effect of the Carmack Amendment and have pleaded their claims accordingly. Further, the Court finds it inappropriate to decide on a motion to dismiss whether Master Moving satisfied the requirements of the Hughes test to limit its liability. See Aydlett v. Flat Rate Long Distance, Inc., No. CV 16-7712 PSG (JCx),

8

2017 WL 2992443, at *5 (C.D. Cal. May 11, 2017) (finding the issue of whether the defendant had limited its liability "not appropriate for resolution at summary judgment, or at this early stage in the litigation"). Whether Defendants have limited their liability to $0.60 per pound involves factual questions the parties have not yet addressed and is better decided on a more developed record. The Court therefore denies Defendants' motion to dismiss Plaintiffs' Carmack Amendment claims.

**B.    IIED Claim**

Although Defendants do not specifically address Plaintiffs' IIED claim, it appears they contend that this claim is preempted by the Carmack Amendment.[3] Plaintiffs cite White v. Mayflower Transit, L.L.C., 543 F.3d 581 (9th Cir. 2008), to argue their IIED claim is not preempted because it is "premised upon conduct which is 'separate and distinct' from the claims giving rise to property damage" and that "occurred well after Plaintiffs' goods were delivered to an unknown storage facility in an unknown location." Opp'n at 6-7. Defendants respond that White does "not give clear guidance on when or how a plaintiff sufficiently alleges that the emotional distress cause of action is from conduct giving rise to property damage." Dkt. 45 at 2. They assert that Plaintiffs fail to argue or allege causation. Id.

---

[3] The Court has done its best to comprehend and address Defendants' arguments given the somewhat convoluted and disorganized nature of their motion to dismiss. For example, the header of section IV of the motion refers to "conversion or related common law" claims, yet Plaintiffs do not assert a conversion claim. See Mot. at 6. Similarly, the sub-headers within section IV refer to Plaintiffs' RICO claim, which is a federal law claim, but most of Defendants' arguments in that section focus on state law claims. Even where Defendants address state law claims generally, they fail to mention Plaintiffs' IIED claim. Because the IIED claim is Plaintiffs' *only* state law claim, the Court assumes Defendants are arguing it is preempted by the Carmack Amendment.

9

To state a claim for IIED, a plaintiff must allege "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Hughes v. Pair, 46 Cal. 4th 1035, 1050 (2009) (quoting Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1004 (1993)). "[T]he Carmack Amendment preempts a claim for intentional infliction of emotional distress to the extent that it arises from the same conduct as the claims for delay, loss or damage to shipped property." White, 543 F.3d at 586.

Defendants argue that all state law claims are preempted by the Carmack Amendment but fail to address whether Plaintiffs' IIED claim "is based solely on the same conduct giving rise to his claims for property damage." Id. They do not explain why Plaintiffs' IIED claim is specifically preempted and therefore fail to address the claim adequately. Moreover—except for the allegations of emotional distress from their dog's death—Plaintiffs have sufficiently alleged that their emotional distress did not arise from the same conduct underlying their Carmack Amendment claims.[4] For example, Plaintiffs allege that Defendants continued to increase the amounts owed by them as part of an unlawful debt collection practice and that they engaged in other deceptive business practices. Compl. ¶¶ 20-23, 43, 46, 93-99, 104. Plaintiffs also allege that Defendants yelled profanities at them and led them to believe that Defendants had taken their property to California when the property was actually being held in storage in West Virginia. Id. ¶¶ 35-42, 53-54. Plaintiffs allege that this conduct—separate and distinct from Defendants' failure to deliver their property—caused them severe emotional distress.

---

[4] Plaintiffs' emotional distress from the death of their dog arose directly from Defendants' failure to deliver their property, and specifically, the specialized litter box. In addition, the Court finds the events that occurred at the Veterans Administration Hospital are too attenuated from the conduct of Defendants to establish IIED.

The Court finds that Plaintiffs have sufficiently stated an IIED claim based on conduct distinct from that giving rise to the claims related to their property under the Carmack Amendment. The Court therefore denies Defendants' motion to dismiss as to Plaintiffs' IIED claim.

C.  **RICO Claim**

As explained above, Defendants appear to argue that the Carmack Amendment preempts Plaintiffs' RICO claim. Mot. at 6. They also argue that Plaintiffs fail to plead two predicate acts of racketeering activity with specificity sufficient to state a RICO claim. Id. at 8-9. Plaintiffs contend their RICO claim should be permitted to proceed to discovery to "determine whether Defendants' alleged practice and procedure of (a) consistently providing low-ball estimates to prospective shippers to obtain their business; (b) falsifying shipping documents wherein a shipper purportedly agrees to a quadruple-fold increase in price; and (c) extorting the improper additional charges from the shipper under threat of disposing, withholding, hiding, and/or auctioning of the shipper's goods, rises to the level of a civil RICO claim." Opp'n at 6.

"The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." United Brotherhood of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't, AFL-CIO, 770 F.3d 834, 837 (9th Cir. 2014) (quoting Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005)) (internal quotation marks and citation omitted). "A 'pattern of racketeering activity' requires at least two predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), within a period of ten years." Canyon Cnty. v. Syngenta Seeds, Inc., 519 F.3d 969, 972 (9th Cir. 2008) (citing 18 U.S.C. § 1961(5)). A plaintiff pleading a RICO claim predicated on fraud must meet the heightened requirements of Federal Rule of Civil Procedure 9(b). Aetna Life Ins. Co. v. Young, No. 2:23-CV-09654-MCS-JPR, 2024 WL 5182638, at *4 (C.D. Cal. Sept. 25, 2024).

11

As an initial matter, the Carmack Amendment does not preempt Plaintiffs' federal RICO claim.  Defendants have not provided any case law or other authority suggesting the Carmack Amendment preempts RICO or any other federal statute.  And the application of RICO in this case does not appear to conflict with the purposes of the Carmack Amendment.  See White, 543 F.3d at 585-86 (explaining claims based on conduct "separate and distinct" from the delivery of goods are not preempted).

Defendants also argue that Plaintiffs' RICO claim fails because the Complaint does not identify two predicate acts with specificity.  The Court disagrees.  Plaintiffs allege that "Master Moving and Batia Zelig have engaged in racketeering activity including the act of threat or extortion, [and] acts indictable under the federal mail and wire fraud statutes."  Compl. ¶ 100.  They allege throughout the Complaint how and when Defendants repeatedly demanded more money from them while Defendants were in possession of Plaintiffs' property, and falsified documents as part of their scheme of unlawful debt collection.  Id. ¶¶ 20-23, 39-43, 46, 92-97.  And they allege that several complaints have been logged by the FMCSA against Master Moving regarding their deceptive practices.  Id. ¶ 98.  Plaintiffs also attached supporting exhibits to their Complaint.  The Court finds that Plaintiffs have included sufficient detail in their allegations to satisfy the heightened pleading requirements and to survive a motion to dismiss.  Because Plaintiffs have alleged at least two predicate acts of racketeering activity, the Court denies Defendants' motion to dismiss as to Plaintiffs' RICO claim.

### D.  Claims against Defendant Zelig

Defendants argue the Court should dismiss the claims against Defendant Zelig because the Complaint contains no allegations supporting Zelig's individual liability.  Mot. at 11-12.  They assert that there are no allegations that alter ego liability applies here or that Zelig entered into a written agreement to answer for the alleged debts of Master Moving.  Id. at 12-13.  Plaintiffs fail to respond to this argument in their opposition.

The Court finds that Plaintiffs' allegations against Zelig are insufficient. Plaintiffs appear to assert only one claim against Zelig—the RICO claim—and provide only three conclusory allegations against him. See Compl. ¶¶ 91, 99-100. Plaintiffs must allege specific facts regarding Zelig's conduct and role in the alleged racketeering activity to support Zelig's individual liability. The Court therefore grants Defendants' motion to dismiss as to the claims against Zelig.

### E.     Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that the court should freely give leave to amend when justice requires. This rule should be interpreted and applied with "extreme liberality." Roth v. Garcia Marquez, 942 F.2d 617, 628 (9th Cir. 1991) (internal quotation marks and citation omitted). The Court grants leave to amend the claims against Defendant Zelig.

### IV. CONCLUSION

Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. The Court GRANTS Defendants' motion as to Plaintiffs' claims against Defendant Zelig with leave to amend, and DENIES Defendants' motion as to Plaintiffs' Carmack Amendment, IIED, and RICO claims. An amended complaint may be filed and served no later than August 25, 2025. Failure to file an amended complaint by that date will waive Plaintiffs' right to do so. If Plaintiffs fail to file an amended complaint by that date, Defendant Master Moving, Inc. must answer the complaint within twenty-one days after that date. Leave to amend is granted only to address the specific issues raised against Defendant Zelig. Leave to add new claims or new defendants is not granted. Plaintiffs must seek leave to amend to add new defendants or new claims by a properly noticed motion. Plaintiffs must provide a redlined version of the amended complaint to the Court's generic chambers email address.

IT IS SO ORDERED.

Date: July 29, 2025

_____
Dale S. Fischer
United States District Judge